**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

DEMETRIUS DARNELL GULLY,

        Defendant.

No. CR 08-3005-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING
CRACK/POWDER RATIO**

_____

**TABLE OF CONTENTS**

*I.* *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    *A. Indictment And Guilty Plea* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    *B. The Crack-To-Powder Disparity Issues* . . . . . . . . . . . . . . . . . . . . 3
    *C. What Is At Stake* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*II.* *LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    *A. Authority To Reject The 100:1 Crack-To-Powder Ratio* . . . . . . . . . . . 6
        *1. The parties' positions* . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        *2. Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    *B. Appropriateness Of A 1:1 Ratio* . . . . . . . . . . . . . . . . . . . . . . . . . 8
        *1. Arguments of the parties* . . . . . . . . . . . . . . . . . . . . . . . . . 8
        *2. Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
            *a. Issues in the crack-to-powder disparity debate* . . . . . . . 9
            *b. Policy-based rejection of the 100:1 ratio* . . . . . . . . . 13
            *c. The reasoned alternative methodology* . . . . . . . . . . . 15
    *C. Application Of The Court's Methodology In This Case* . . . . . . . . . . . 21

*III.* *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

D efendant Demetrius Darnell Gully was before the court on May 14, 2009, for sentencing on his guilty plea, without a plea agreement, to four charges of distributing less than 5 grams of crack cocaine, arising from "controlled buys" in January 2008, after a prior felony drug conviction in 2004. Three of the counts charged that the distributions occurred within 1,000 feet of a public playground or school. This "crack" case raises the following questions: (1) Whether the court has discretion to impose a 1:1 crack-to-powder ratio in sentencing; and (2) whether a 1:1 ratio is appropriate in this case. This written ruling addresses only these questions, although other matters were resolved at defendant Gully's sentencing hearing.

## I.  INTRODUCTION

### A.  Indictment And Guilty Plea

Defendant Demetrius Gully was charged with the following offenses in a March 26, 2008, Superseding Indictment (docket no. 16): distributing and aiding and abetting another to distribute approximately 4.42 grams of crack cocaine on or about January 3, 2008, having previously been convicted of a felony drug offense, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 851 and 18 U.S.C. § 2 (**Count 1**); distributing and aiding and abetting another to distribute approximately 4.83 grams of crack cocaine on or about January 8, 2008, within 1,000 feet of a public playground or school, having previously been convicted of a felony drug offense, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), 851, and 860(a) and 18 U.S.C. § 2 (**Count 2**); distributing and aiding and abetting another to distribute approximately 4.08 grams of crack cocaine on or about January 9, 2008, within 1,000 feet of a public playground or school, having previously been convicted of a felony drug offense, in violation of 21 U.S.C. §§ 841(a)(1),

841(b)(1)(C), 851, and 860(a) and 18 U.S.C. § 2 (**Count 3**); and distributing approximately 3.49 grams of crack cocaine on or about January 16, 2008, within 1,000 feet of a public playground or school, having previously been convicted of a felony drug offense, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), 851, and 860(a) (**Count 4**). A co-defendant, LaMarcus Lamar Gully, was charged with the same four counts and a fifth count of distributing and aiding and abetting another to distribute crack cocaine within 1,000 feet of a public playground or school.

On August 29, 2008, defendant Demetrius Gully pleaded guilty to the offenses charged against him, without a plea agreement, before a magistrate judge, and this court accepted his guilty plea on September 15, 2008. After various continuances, Gully's sentencing hearing was set for May 14, 2009.

## B. The Crack-To-Powder Disparity Issues

By order (docket no. 89) dated March 20, 2009, the court directed the parties to file simultaneous briefs on the following issues: (1) Whether the court has discretion to impose a 1:1 crack-to-powder ratio in sentencing; and (2) whether a 1:1 ratio is appropriate in this case. The parties filed briefs addressing these questions as directed on April 8, 2009. *See* Defendant's Brief As Directed By The District Court As To Crack/Powder Ratio (docket no. 90); Prosecution's Brief As Directed By The District Court (docket no. 91). This written ruling addresses only these questions, although other matters were resolved at defendant Gully's sentencing hearing.[1]

---

[1]Other matters that the court was required to resolve at the sentencing hearing included the quantities of crack for which defendant Gully could be held responsible and, hence, the applicable offense level and advisory guidelines range under the Sentencing

(continued...)

## C.  What Is At Stake

Before addressing these questions, however, the court will demonstrate what is at stake in the determination of the appropriate crack-to-powder ratio.  This case, like any of tens of thousands of other "crack" cases, will serve as an example.  Using the quantities of controlled substances that the court found at the sentencing hearing, defendant Gully was sentenced on the basis of 7 grams of cocaine salt (powder cocaine) and 47.27 grams of cocaine base (crack cocaine), he was denied a reduction for acceptance of responsibility, but he was not given an upward departure based on under-representation of criminal history, as the prosecution had requested, so that his criminal history category was III. Because the case involves differing controlled substances, the quantity of each controlled substance must be converted to a marijuana equivalent to determine a single offense level pursuant to U.S.S.G. § 2D1.1, note 10.  According to the Drug Equivalency Tables in § 2D1.1, note 10, 1 gram of cocaine (powder) is equivalent to 200 grams of marijuana, but 1 gram of cocaine base (crack) is equivalent to 20 kilograms of marijuana, *i.e.*, 100 times more marijuana.  Thus, the marijuana equivalent for 7 grams of cocaine salt is 14 kilograms, and the marijuana equivalent for 47.27 grams of crack cocaine is 945.20 kilograms, yielding a total of 959.20 kilograms of marijuana equivalent.  Pursuant to U.S.S.G. § 2D1.1(c)(6), the base offense level for more than 700 kilograms, but less than 1,000 kilograms of marijuana is 30.  However, this base offense level is reduced by two

---

[1](...continued)
Guidelines; whether Gully was entitled to reductions for acceptance of responsibility; the extent to which Gully's criminal history was under-represented in the advisory guidelines criminal history category calculation; whether Gully was entitled to a downward variance on various grounds in addition to the crack/powder disparity under the Sentencing Guidelines addressed here; and whether the court should consider certain of the exhibits offered by the prosecution at the sentencing.

levels to 28 pursuant to note 10(D), because the offenses involved crack cocaine and another controlled substance, then increased by one level to 29 pursuant to U.S.S.G. § 2D1.2(a)(2), because some of the offenses occurred near a protected location. With a criminal history category of III, the resulting advisory guideline sentence, using a 100:1 ratio, is 108 to 135 months.[2]

On the other hand, if the court rejects the 100:1 ratio in U.S.S.G. § 2D1.1, note 10, there is no need to convert the total quantities of cocaine salt and crack cocaine to marijuana equivalents. Instead, the relevant quantity of controlled substances would be 54.27 grams of cocaine (7 grams of cocaine salt + 47.27 grams of crack cocaine = 54.27 grams of cocaine) and, pursuant to U.S.S.G. § 2D1.1(c)(13), the base offense level would be 16. Although there would be no two-level reduction pursuant to note 10(D), because all forms of cocaine would be treated as the same controlled substance, the base offense level would again be increased one level to 17 pursuant to U.S.S.G. § 2D1.2(a)(2), because some of the offenses occurred near a protected location. With a criminal history category of III, Gully's resulting advisory guideline range, using a 1:1 ratio, would be 30 to 37 months.

In short, if the court uses the 100:1 crack-to-powder ratio in U.S.S.G. § 2D1.1, note 10, defendant Gully's minimum advisory guideline sentence would be a little more

---

[2]In the course of the sentencing hearing, the court erroneously found that the advisory sentencing guideline range, using a 100:1 ratio, was 135 to 168 months, because the court omitted the two-level reduction pursuant to note 10(D), and, thus, used a base offense level of 31, not 29. The court, not the defense or the prosecution, caught this mistake shortly after the sentencing hearing. The court has remedied this error in the Judgment. More importantly, the court would have imposed the same sentence ultimately imposed, using a 1:1 ratio and the 18 U.S.C. § 3553(a) factors, even had the court correctly calculated the advisory guideline range using the 100:1 ratio as 108 to 135 months, rather than 135 to 168 months.

than three-and-one-half times longer than if the court uses a 1:1 ratio, and, in real terms, his advisory guideline sentence would be at least six years and six months longer. The difference certainly begs the question of whether it can be justified solely on the basis of the form of cocaine at issue.[3]

## II. LEGAL ANALYSIS

### A. Authority To Reject The 100:1 Crack-To-Powder Ratio

#### 1. The parties' positions

As to the answer to the first question that the court posed to the parties, whether the court has discretion to impose a 1:1 crack-to-powder ratio in sentencing, the parties are in general agreement. The prosecution acknowledges that, in *United States v. Kimbrough*, ___ U.S. ___, 128 S. Ct. 558, 572 (2007), the Supreme Court held that the Anti-Drug Abuse Act of 1986 "does not require . . . sentencing courts . . . to adhere to the 100-to-1 ratio for crack cocaine quantities other than those that trigger the statutory mandatory minimum sentences," and then clarified in *Spears v. United States*, ___, U.S. ___, 129 S. Ct. 840, 843-44 (2009) (*per curiam*), "that district courts are entitled to reject and vary categorically from the crack-cocaine Guidelines based on a policy disagreement with those Guidelines." Based on these decisions, the prosecution concedes that a district court has the discretion to impose a 1:1 crack-to-powder ratio at sentencing in a particular case, but

---

[3] "Crack cocaine" is, after all, just cocaine powder "cooked" with water and baking soda. *See United States v. Vesey*, 330 F.3d 1070, 1073 (8th Cir. 2003) ("cocaine base" within the meaning of 21 U.S.C. § 841 means "crack cocaine" as defined in U.S.S.G. § 2D1.1); U.S.S.G. § 2D1.1, Notes to Drug Quantity Table (D) ("'Cocaine base,' for purposes of this guideline, means 'crack.' 'Crack' is the street name for a form of cocaine base, usually prepared by processing cocaine hydrochloride [powder cocaine] and sodium bicarbonate [baking powder], and usually appearing in a lumpy, rocklike form.").

contends that such a ratio may not be appropriate in every case. The prosecution points out that, in a pre-*Spears* decision, *United States v. Cawthorn*, 527 F.3d 678, 679-80 (8th Cir. 2008), the Eighth Circuit Court of Appeals held that *Kimbrough* does not *require* the court to consider the crack/powder disparity when imposing sentence for a crack offense, only that the court errs if it fails to do so because it does not believe that it can.

Defendant Gully, likewise, cites *Kimbrough* and *Spears* to support his position that there is no apparent reason why the court cannot employ a 1:1 ratio *in a particular case* to fashion a reasonable sentence, if the court rejects the 1:1 ratio based on a policy disagreement with the 100:1 ratio in the Sentencing Guidelines. He then points out that, in a pre-*Kimbrough* case, *United States v. Pho*, 433 F.3d 53 (1st Cir. 2006), the First Circuit Court of Appeals recognized, "The decision to employ a 100:1 crack-to-powder ratio rather than a 20:1 ratio, a 5:1 ratio, or a 1:1 ratio is a policy judgment, pure and simple," although he acknowledges that this statement was made in support of that court's conclusion—since abrogated by *Kimbrough* and *Spears*—that "the district court's categorical rejection of the 100:1 ratio impermissibly usurps Congress's judgment about the proper sentencing policy for cocaine offenses." *Pho*, 433 F.3d at 62.

Thus, the parties agree that the court can reject the 100:1 ratio, and adopt a 1:1 ratio, *in a particular case*.

### 2. *Analysis*

This court finds that, contrary to the timid positions of both parties, *Spears* freed this court from the notion that a sentencing court can only act on a policy disagreement with applicable Sentencing Guidelines on the ground that the Guidelines yield an excessive sentence in a particular case. Rather, as this court recently explained in *United States v. Beiermann*, 599 F. Supp. 2d 1087 (N.D. Iowa 2009), a particular guideline may be rejected on categorical, policy grounds, even in a "mine-run" case, and not simply based

on an individualized determination that it yields an excessive sentence in a particular case. *Beiermann*, 599 F. Supp. 2d at 1104-06 (citing *Spears,* ___ U.S. at ___, 129 S. Ct. at 842-43). In other words, the court may reject the 100:1 crack-to-powder ratio set out in U.S.S.G. § 2D1.1, note 10, in *every* case, on policy grounds, not just in a *particular* case, on the ground that it yields an excessive sentence in that case.

## B. Appropriateness Of A 1:1 Ratio

### 1. Arguments of the parties

Because the court finds that it has the authority to reject the 100:1 crack-to-powder ratio under the Sentencing Guidelines, the court turns to the second question that it posed to the parties, whether a 1:1 ratio is appropriate in this case. Focusing only on *this* case, the prosecution argues that the court should not use a 1:1 ratio, because defendant Gully was not just a street-level dealer (on four occasions), but was more involved in dealing crack, over several years, and may even have operated as the primary local source for crack in Fort Dodge, Iowa, for some time. Thus, the prosecution argues that this is not a "mine-run" crack distribution case in which a 1:1 ratio might be more appropriate.

Defendant Gully counters that he is the sort of low-level trafficker whose culpability the Sentencing Commission suggested in its 2002 Report to Congress was overstated by the mandatory minimum sentences and 100:1 ratio for crack offenses. Rather, he argues that his convictions are for fairly small quantities of crack, so that these offenses are not any more serious than offenses involving the same amount of powder cocaine. Thus, he contends that the 100:1 ratio overstates his culpability, and a 1:1 ratio more appropriately addresses the seriousness of his crime.

## 2. Analysis

### a. Issues in the crack-to-powder disparity debate

The parties' responses do not even remotely address the full scope of the question of whether a 1:1 ratio (or some other ratio less than 100:1) is appropriate in this case, let alone the implicit question of whether a 1:1 ratio is appropriate in "crack" cases generally. For example, their responses do not address the policy rationale for either a 100:1 ratio or any other lower ratio or the history of and the issues in the debate over the appropriate ratio. Furthermore, the parties' responses miss the point, because they both assume that the crack-to-powder ratio is an appropriate proxy for the supposed seriousness of crack cocaine crimes relative to powder cocaine crimes generally, or even a proxy for the seriousness of a particular defendant's offenses, so that the appropriate ratio might vary from case to case depending, for example, on the nature of a particular defendant's drug-trafficking offenses and related conduct. It is that very assumption that the ratio is an appropriate proxy for the seriousness of crack crimes and related harms in the Guidelines, however, that is both the basis for the ongoing dispute about the appropriate ratio and the basis for this court's fundamental policy disagreement with the 100:1 ratio.

The parties would not have needed to look any further than the Supreme Court's decision in *Kimbrough* for an explanation of the history of and issues in the debate over the appropriate crack-to-powder ratio.[4] As the Court recognized in *Kimbrough*,

> The Commission did not use [its usual] empirical approach [based on data about past sentencing practices] in developing the Guidelines sentences for drug-trafficking offenses. Instead, it employed the 1986 Act's weight-driven

---

[4]Other decisions, of various federal courts, far too numerous for meaningful citation, have also addressed the history and contents of the debate over the appropriate crack-to-powder ratio, as have numerous commentators.

scheme. The Guidelines use a drug quantity table based on drug type and weight to set base offense levels for drug trafficking offenses. See USSG § 2D1.1(c). In setting offense levels for crack and powder cocaine, the Commission, in line with the 1986 Act, adopted the 100-to-1 ratio. The statute itself specifies only two quantities of each drug, but the Guidelines "go further and set sentences for the full range of possible drug quantities using the same 100-to-1 quantity ratio." 1995 Report 1. The Guidelines' drug quantity table sets base offense levels ranging from 12, for offenses involving less than 250 milligrams of crack (or 25 grams of powder), to 38, for offenses involving more than 1.5 kilograms of crack (or 150 kilograms of powder). USSG § 2D1.1(c).

*Kimbrough*, ___U.S. at ___, 128 S. Ct. at 567 (footnote omitted). The Court then explained the Commission's recognition of the principal problems with the 100:1 ratio:

*Although the Commission immediately used the 100-to-1 ratio to define base offense levels for all crack and powder offenses, it later determined that the crack/powder sentencing disparity is generally unwarranted. Based on additional research and experience with the 100-to-1 ratio, the Commission concluded that the disparity "fails to meet the sentencing objectives set forth by Congress in both the Sentencing Reform Act and the 1986 Act."* 2002 Report 91. In a series of reports, the Commission identified three problems with the crack/powder disparity.

First, the Commission reported, the 100-to-1 ratio rested on assumptions about "the relative harmfulness of the two drugs and the relative prevalence of certain harmful conduct associated with their use and distribution that more recent research and data no longer support." *Ibid.;* see United States Sentencing Commission, Report to Congress: Cocaine and Federal Sentencing Policy 8 (May 2007), available at http://www.ussc.gov/r_congress/cocaine2007.pdf (hereinafter 2007 Report) (ratio Congress embedded in the statute far

"overstate[s]" both "the relative harmfulness" of crack cocaine, and the "seriousness of most crack cocaine offenses"). For example, the Commission found that crack is associated with "significantly less trafficking-related violence . . . than previously assumed." 2002 Report 100. It also observed that "the negative effects of prenatal crack cocaine exposure are identical to the negative effects of prenatal powder cocaine exposure." *Id.,* at 94. The Commission furthermore noted that "the epidemic of crack cocaine use by youth never materialized to the extent feared." *Id.,* at 96.

Second, the Commission concluded that the crack/powder disparity is inconsistent with the 1986 Act's goal of punishing major drug traffickers more severely than low-level dealers. Drug importers and major traffickers generally deal in powder cocaine, which is then converted into crack by street-level sellers. See 1995 Report 66-67. But the 100-to-1 ratio can lead to the "anomalous" result that "retail crack dealers get longer sentences than the wholesale drug distributors who supply them the powder cocaine from which their crack is produced." *Id.,* at 174.

Finally, the Commission stated that the crack/powder sentencing differential "fosters disrespect for and lack of confidence in the criminal justice system" because of a "widely-held perception" that it "promotes unwarranted disparity based on race." 2002 Report 103. Approximately 85 percent of defendants convicted of crack offenses in federal court are black; thus the severe sentences required by the 100-to-1 ratio are imposed "primarily upon black offenders." *Ibid.*

Despite these observations, the Commission's most recent reports do not urge identical treatment of crack and powder cocaine. In the Commission's view, "some differential in the quantity-based penalties" for the two drugs is warranted, *id.,* at 102, because crack is more addictive than powder, crack offenses are more likely to involve weapons or bodily injury, and crack distribution is associated with higher levels of crime, see *id.,* at 93-94, 101-102. But the 100-to-1

crack/powder ratio, the Commission concluded, significantly overstates the differences between the two forms of the drug. Accordingly, the Commission recommended that the ratio be "substantially" reduced. *Id.,* at viii.

*Kimbrough*, ___U.S. at ___, 128 S. Ct. at 568 (emphasis added).

As the Supreme Court recognized—and this court believes much to the Commission's credit—the Commission has not simply stood idly by, but has attempted, repeatedly, to address what it perceived to be the problems with the 100:1 ratio, but has generally been thwarted by Congress:

> The Commission has several times sought to achieve a reduction in the crack/powder ratio. In 1995, it proposed amendments to the Guidelines that would have replaced the 100-to-1 ratio with a 1-to-1 ratio. Complementing that change, the Commission would have installed special enhancements for trafficking offenses involving weapons or bodily injury. See Amendments to the Sentencing Guidelines for United States Courts, 60 Fed.Reg. 25075-25077 (1995). Congress, acting pursuant to 28 U.S.C. § 994(p), rejected the amendments. See Pub.L. 104-38, § 1, 109 Stat. 334. Simultaneously, however, Congress directed the Commission to "propose revision of the drug quantity ratio of crack cocaine to powder cocaine under the relevant statutes and guidelines." § 2(a)(2), *id.*, at 335.
>
> In response to this directive, the Commission issued reports in 1997 and 2002 recommending that Congress change the 100-to-1 ratio prescribed in the 1986 Act. The 1997 Report proposed a 5-to-1 ratio. See United States Sentencing Commission, Special Report to Congress: Cocaine and Federal Sentencing Policy 2 (Apr.1997), http://www.ussc.gov/r_congress/newcrack.pdf. The 2002 Report recommended lowering the ratio "at least" to 20 to 1. 2002 Report viii. Neither proposal prompted congressional action.
>
> The Commission's most recent report, issued in 2007, again urged Congress to amend the 1986 Act to reduce the 100-to-1 ratio. This time, however, the Commission did not

> simply await congressional action. Instead, the Commission adopted an ameliorating change in the Guidelines. See 2007 Report 9. The alteration, which became effective on November 1, 2007, reduces the base offense level associated with each quantity of crack by two levels. See Amendments to the Sentencing Guidelines for United States Courts, 72 Fed.Reg. 28571-28572 (2007). This modest amendment yields sentences for crack offenses between two and five times longer than sentences for equal amounts of powder. See *ibid.* Describing the amendment as "only . . . a partial remedy" for the problems generated by the crack/powder disparity, the Commission noted that "[a]ny comprehensive solution requires appropriate legislative action by Congress." 2007 Report 10.

*Kimbrough*, ___U.S. at ___, 128 S. Ct. at 569 (footnotes omitted).

### b.    *Policy-based rejection of the 100:1 ratio*

The problems with the 100:1 crack-to-powder ratio and the history of the debate that the guideline ratio has engendered set the stage for this court's explanation of its policy disagreement with that ratio. This court's first policy objection to the 100:1 ratio in U.S.S.G. § 2D1.1, note 10, is that, as the Supreme Court has recognized, the 100:1 ratio "'do[es] not exemplify the Commission's exercise of its characteristic institutional role.'" *Spears*, ___U.S. at ___, 129 S. Ct. at 843 (quoting *Kimbrough*, ___ U.S. at ___, 128 S. Ct. at 563); *see also Kimbrough*, ___ U.S. at ___, 128 S. Ct. at 567 ("The Commission did not use [its usual] empirical approach [based on data about past sentencing practices] in developing the Guidelines sentences for drug-trafficking offenses. Instead, it employed the 1986 Act's weight-driven scheme."). Rather, that ratio is the result of congressional mandates that interfere with and undermine the work of the Sentencing Commission. Other policy objections to the 100:1 ratio are precisely those presented by the Commission itself as early as 1995: The assumptions about the relative harmfulness of crack cocaine and powder cocaine and the harms that come with trafficking in those controlled substances

are not supported by recent research and data; the 100:1 ratio is inconsistent with the goals of the 1986 Act, because it tends to punish low-level crack traffickers more severely than major traffickers in powder cocaine; and its disproportionate impact on black offenders fosters disrespect for and lack of confidence in the criminal justice system. *Kimbrough*, ___U.S. at ___, 128 S. Ct. at 568.

Moreover, even if crack is more addictive than powder, and even if crack offenses are more likely to involve weapons or bodily injury or to be associated with higher levels of crime, *see id.*, the 100:1 ratio is a remarkably blunt instrument to address those effects, because it simply assumes that the quantity ratio can be a proxy for these other harms, instead of basing the punishment on the additional criminal effects and use of weapons *when they are present in a particular case*. In addition, the relative ease with which powder cocaine can be converted to crack cocaine, which, among other things, allows sentences to be dramatically affected by when government officials decide to seize and arrest drug dealers, *see* United States Sentencing Commission, Special Report to Congress: Cocaine and Federal Sentencing Policy (April 1997) at 3-8, strongly suggests that the distinctions between the two controlled substances are artificial, at best.

Finally, in this case, the prosecution offered no argument or logical reason why crack cocaine and powder cocaine should be treated differently, on the basis of the controlled substances themselves. Rather, the prosecution reiterated the policy line, which this court rejects, that different treatment of crack and powder is appropriate in this case because of this defendant's conduct, *i.e.*, that the crack-to-powder ratio is an appropriate proxy for other kinds of harm or criminal conduct perceived to come with crack trafficking. Again, this court believes that the appropriate course is to treat interchangeable forms of cocaine as equivalents, and to enhance punishment when

additional criminal effects and use of weapons, for example, are present in a particular case.

### c. *The reasoned alternative methodology*

As the Supreme Court made clear in *Spears*, once the sentencing court rejects the 100:1 ratio, it then has the authority to adopt some other well-reasoned basis for sentencing, even in a "mine-run" crack case. *Spears*, ___ U.S. at ___, 129 S. Ct. at 844. In *Spears*, in which this court was the sentencing court, this court adopted a 20:1 ratio based on two other district court decisions that, in turn, reflected the Sentencing Commission's expert judgment that a 20:1 ratio would be appropriate in a "mine-run" case. *United States v. Perry,* 389 F. Supp. 2d 278, 307-308 (D.R.I. 2005) (concluding that a 20:1 ratio, as suggested by the Commission in its 2002 Report, "makes the most sense"); *United States v. Smith,* 359 F. Supp. 2d 771, 781-782 (E.D. Wis. 2005) (also using a 20:1 ratio, because the Commission's proposal for modifying mandatory minimum thresholds, translated into guidelines terms, would have resulted in a roughly 20:1 ratio); 2002 Report to Congress 106-107, App. A, pp. 3-6. The Supreme Court affirmed. *Spears*, ___ U.S. at ___, 129 S. Ct. at 844.

It now appears to this court, however, that even the Commission's recommendation of a 20:1 ratio was influenced at least as much by prior congressional rejections of lower ratios and the policy considerations that Congress had mandated be part of the calculus of the appropriate ratio than by empirical evidence concerning the appropriate sentences for crack offenses. *Compare* Amendments to the Sentencing Guidelines for United States Courts, 60 Fed.Reg. 25075-25077 (1995) (1:1 ratio); *with* United States Sentencing Commission, Special Report to Congress: Cocaine and Federal Sentencing Policy 2 (April 1997) (5:1 ratio); United States Sentencing Commission, Report to Congress: Cocaine and Federal Sentencing Policy, viii (May 2002) (recommending reducing the ratio to "at least"

20:1). The reasons for this court's policy objections to the 100:1 ratio apply with equal force to a 20:1 ratio: A 20:1 ratio still improperly uses the quantity ratio as a proxy for various kinds of harm and violence that may or may not come with trafficking of crack cocaine in a particular case. Thus, this court no longer considers 20:1 to be the most appropriate ratio

Nor does the Department of Justice, under the new administration. In a recent statement in a Senate hearing, Lanny A. Breuer, Assistant Attorney General, Criminal Division, indicated the Department's intention to "focus on formulating a new federal cocaine sentencing policy" that, *inter alia*, "completely eliminates the sentencing disparity between crack and powder cocaine but also fully accounts for violence, chronic offenders, weapon possession and other aggravating factors associated—in individual cases—with both crack and powder cocaine trafficking." Statement of Lanny A. Breuer, Assistant Attorney General, Criminal Division, United States Department of Justice, Before the United States Senate Committee on the Judiciary, Subcommitee on Crime and Drugs, Hearing Entitled "Restoring Fairness to Federal Sentencing: Addressing the Crack-Powder Disparity," 10-11 (April 29, 2009) (April 29, 2009, Statement of AAG Breuer). AAG Breuer also set out new directives to federal prosecutors in the field:

> Until a comprehensive solution—one that embodies new quantity thresholds and perhaps new sentencing enhancements—can be developed and enacted as legislation by Congress and as amended guidelines by the Sentencing Commission, federal prosecutors will adhere to existing law. We are gratified that the Sentencing Commission has already taken a small step to ameliorate the 100:1 ratio contained in existing statutes by amending the guidelines for crack cocaine offenses. We will continue to ask federal courts to calculate the guidelines in crack cocaine cases, as required by Supreme Court decisions. However, we recognize that federal courts

have the authority to sentence outside the guidelines in crack
cases or even to create their own quantity ratio. Our
prosecutors will inform courts that they should act within their
discretion to fashion a sentence that is consistent with the
objectives of 18 U.S.C. § 3553(a) and our prosecutors will
bring the relevant case-specific facts to the courts' attention.

April 29, 2009, Statement of AAG Breuer at 11. Thus, even the Department of
Justice—which, at least in its local embodiment as the United States Attorney's Office for
the Northern District of Iowa has heretofore done everything in its power to maximize
crack sentences and, indeed, all criminal sentences—now intends to seek a sentencing
scheme that eliminates the sentencing disparities between crack and powder cocaine,
signaling that the appropriate ratio may be 1:1, and that separately accounts for violence,
chronic offenders, weapon possession, and other aggravating factors present in individual
cases.

In a Supplemental Sentencing Memorandum (docket no. 96), filed May 13, 2009,
the prosecution acknowledged that United States Attorneys' Offices had received new
guidance concerning sentencing crack cocaine offenses on May 1, 2009, consistent with
AAG Breuer's comments above. The prosecution stated, however, that the Department
of Justice's position with respect to variance motions in crack cocaine cases is to be
determined on a case-by-case basis, and that downward variances may be opposed on case-
specific aggravating factors (such as the use of violence, the presence of firearms, or
recidivism) under the factors set out at 18 U.S.C. § 3553(a). In this case, the prosecution
argued that there are a number of aggravating factors, identified in its earlier sentencing
memorandum and briefing ordered by the court, but the prosecution did not identify the
sentencing range that it believed was appropriate in this case in light of the crack-to-
powder disparity and other aggravating factors.

The court finds, however, that the problems with the 100:1 ratio (or a 20:1 ratio) exist whether or not the case is a "mine-run" case, so that, contrary to the prosecution's assertions here, whether or not the case before the court is a "mine-run" case is irrelevant to the determination of the appropriate ratio. The prosecution's arguments seem to suggest some kind of "sliding scale," where the crack-to-powder ratio varies, for example, with the extent of the defendant's crack trafficking or the extent of his violent behavior, from 1:1 in a "mine-run" case, presumably up to 100:1 for a kingpin or violent offender. The prosecution also suggested at the sentencing hearing that the court should start with the guideline calculation, based on a 100:1 ratio, then vary downward based on the court's rejection of the crack-to-powder disparity, apparently basing the ratio ultimately used on the degree to which the case is a "mine-run" case or involves aggravating factors. In this court's view, whether a defendant is an Eagle Scout or a street thug is irrelevant to the determination of the appropriate crack-to-powder ratio in a particular case, because the ratio should not be a proxy for factors that should properly be considered separately pursuant to 18 U.S.C. § 3553(a). Moreover, either a "sliding scale" method or "downward variance" method, would rob sentencing in "crack" cases of any predictability or uniformity whatsoever, because it would be unclear what ratio would be applicable in any particular case. As Judge Colloton prophetically observed in his dissent in the *en banc* decision of the Eighth Circuit Court of Appeals in *Spears*, 533 F.3d 715 (8th Cir. 2008)—which was adopted to a large extent by the Supreme Court in its summary reversal of the *en banc* decision, *see Spears v. United States*, ___, U.S. ___, 129 S. Ct. 840, 843-44 (2009) (*per curiam*)—a sentencing scheme that requires a sentencing court to make a "seat-of-the-pants judgment in each mine-run case about how much to vary from the advisory guidelines based solely on the 'crack/powder disparity'" does not advance the goal of a reasoned sentencing process, in either honesty, uniformity, or transparency.

*Spears*, 533 F.3d at 721 (Colloton, J., dissenting). Rather, the sentencing judge "should be permitted to use a consistent methodology to achieve a consistent degree of variance in similar cases," based on the policy view that the crack-to-powder disparity yields a sentence greater than necessary to achieve the purposes of § 3553(a) in a mine-run case. *Id.*

The court finds that the appropriate methodology is to use a 1:1 crack-to-powder ratio not just in an individual case or in a "mine-run" crack case, but in all "crack" cases, then to enhance sentences for individual defendants for trafficking offenses that actually involve weapons or bodily injury, or for other conduct warranting enhancement under 18 U.S.C. § 3553(a), as the Sentencing Commission proposed in 1995. *See Kimbrough*, ___U.S. at ___, 128 S. Ct. at 569 (citing Amendments to the Sentencing Guidelines For United States Courts, 60 Fed.Reg. 25075-25077 (1995)). Using this methodology, the parties' arguments about whether or not this particular defendant is merely a street-level dealer or a major trafficker should be accounted for in his sentence, but in the consideration of the 18 U.S.C. § 3553(a), including characteristics of the defendant and circumstances of the offenses, rather than in the crack-to-powder ratio. Specifically, where the Commission—and now the Department of Justice—has proposed sentencing enhancements for trafficking offenses involving weapons or bodily injury, the court finds that it can properly consider such offense-related conduct in its consideration of "the nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1). Similarly, where a defendant has a history of violence, whether or not such violence is related to prior drug-trafficking, or was involved in higher levels of crime, that information would warrant enhancement of the defendant's sentence pursuant to that part of § 3553(a)(1) that requires the court to consider "the history and characteristics of the defendant." As Judge Colloton also noted, "[a]llowing sentencing courts to rely on the range indicated by an alternative crack/powder

ratio also helps the sentencing process evolve," for example, because the courts and Congress can develop appropriate considerations for enhancement of sentences. *Spears*, 533 F.3d at 722 (Colloton, J., dissenting).

In other words, in this court's view, the appropriate method is to calculate the guideline range under existing law (*i.e.*, using the 100:1 ratio and any appropriate guideline adjustments or departures), but then to calculate an alternative guideline range using a 1:1 ratio, and to use or vary from that alternative guideline range depending upon the court's consideration of the 18 U.S.C. § 3553(a) factors to account, for example, for the defendant's history of violence, the presence of firearms, or the defendant's recidivism.[5] The difference between this court's method and the prosecution's method is that the court will use a readily ascertainably guideline range based on a 1:1 ratio, after rejecting the 100:1 guideline ratio on policy grounds, then vary based on case- or

---

[5]This methodology is consistent with the three-step sentencing methodology recently reiterated by the Eighth Circuit Court of Appeals:

> The first step in the sentencing process is to determine the proper guidelines range for the defendant's sentence. *Gall v. United States,* ---U.S. ----, 128 S. Ct. 586, 596, 169 L. Ed. 2d 445 (2007); *[United States v.] Thundershield,* 474 F.3d [503,] 506-07 [(8th Cir. 2007)]. A court should then consider whether a departure or a variance is appropriate and apply the factors in 18 U.S.C. § 3553(a). *Gall,* 128 S. Ct. at 596-97; *Thundershield,* 474 F.3d at 506-07.

*United States v. Roberson*, 517 F.3d 990, 993 (8th Cir. 2008); *United States v. Rivera*, 439 F.3d 446, 447 (8th Cir. 2006) ("In *United States v. Haack,* 403 F.3d 997, 1002-03 (8th Cir. 2005), we outlined the procedure a district court is to follow in imposing a post-*Booker* sentence. First, the district court should determine the Guidelines sentencing range. Second, the district court should determine whether any traditional departures are appropriate. Third, the district court should apply all other section 3553(a) factors in determining whether to impose a Guidelines or non-Guidelines sentence.").

defendant-specific factors pursuant to 18 U.S.C. § 3553(a), instead of varying (probably downward) some unpredictable amount from the 100:1 ratio guideline range based, in part, on rejection of the 100:1 guideline ratio on policy grounds, with the ultimate crack-to-powder ratio obscured by consideration of other factors.

### C.  Application Of The Court's Methodology In This Case

Indeed, in this case, the court first calculated the defendant's advisory sentencing guideline range based on the quantities of powder and crack cocaine actually found by the court, using a 100:1 ratio under the current Guidelines, and then considered whether any adjustments or departures from that guideline range were appropriate, for example, based on acceptance of responsibility (which the court denied) and under-representation of criminal history (which the court denied, as a ground for departure, finding any under-representation insufficient to move from the bottom of criminal history category III to criminal history IV, although the court later considered under-representation of criminal history under the appropriate 18 U.S.C. § 3553(a) factors).  The 100:1 ratio guideline calculations resulted in an advisory guideline range of 108 to 135 months.  The court then did an alternative guideline range calculation using a 1:1 ratio, on the basis of a policy rejection of the 100:1 guideline ratio, which resulted in an alternative advisory guideline range of 30 to 37 months, with the same denial of a reduction for acceptance of responsibility and denial of an upward departure for under-representation of criminal history.  Next, the court denied the defendant's motion for a downward variance, on grounds other than the crack-to-powder disparity.[6]  Finally, the court considered the 18

---

[6]The defendant argued that he should receive a downward variance, apparently from either the 100:1 guideline range or the alternative 1:1 guideline range, because he was

(continued...)

U.S.C. § 3553(a) factors to determine what sentence was sufficient, but not greater than necessary to serve the purposes of sentencing. 18 U.S.C. § 3553(a). Specifically, the court considered the defendant's history of assaultive conduct, including assaultive conduct toward women; his continued drug dealing while on pretrial release; the court's finding that he was not merely a street dealer of crack, but a larger supplier of crack cocaine in Fort Dodge, Iowa; his irresponsible behavior in fathering six children by four women while having no employment history; his lack of employment history itself suggesting that he was making a living dealing drugs; evidence that he had gotten his sister to try to "take the rap" for his assault on another woman; and his repeated criminal offenses suggesting recidivism and the likelihood that he would reoffend unless incarcerated, all mitigated only by the lack of parental supervision during his formative years. These factors led the court to conclude that a sentence of 84 months of incarceration—more than twice the upper end of his alternative guideline range based on a 1:1 ratio—was sufficient, but not greater than necessary in this case.

### III. CONCLUSION

The court finds that it has the discretion to impose a 1:1 crack/powder ratio in sentencing and that a 1:1 ratio is appropriate not only in this case, but in all "crack" cases, while other factors for which higher ratios have been used as a proxy are properly

---

[6](…continued)
essentially raised in a state training school and had drug and alcohol problems from as early as the age of twelve, but never got substance abuse treatment. The court again found these factors insufficient to warrant a downward variance, but did consider them relevant to the determination of the appropriate sentence under the § 3553(a) factors.

addressed in the consideration of the 18 U.S.C. § 3553(a) factors.  Defendant Gully was sentenced accordingly.

**IT IS SO ORDERED.**

**DATED** this 18th day of May, 2009.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA